# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

ROBERTSON-CECO CORPORATION,

       Plaintiff,

v.                                Case No.: 3:03cv475/RV/EMT

MARY NASH CORNELIUS,

       Defendant.[1]

_____/

## ORDER

       There are several motions pending before the court. The plaintiff, Robertson-Ceco Corporation, moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure (doc. 78). The defendant, Mary Nash Cornelius, has filed a motion for sanctions (doc. 89), a motion for judicial notice (doc. 90), and a motion to amend her previously-filed answer (doc. 92).

## I.    BACKGROUND

### A.  Facts

       N.I.C., Inc. ("NIC") was formed as an Alabama corporation in October 1996. William J. Cornelius ("William") was president and sole shareholder of the corporation. His wife Mary Nash Cornelius ("Mary") and son William Scott

---

[1]The above caption has been changed to accurately reflect the status of and relationship between the parties in this case. Although Robertson-Ceco Corporation has not officially moved to dismiss William Scott Cornelius, it has represented that it is no longer pursuing its claim against him (doc. 69 at ¶3). This representation is understood to be a voluntary dismissal of that party and claim. He is dismissed, which leaves Mary Nash Cornelius as the only remaining defendant.

Cornelius ("Scott") were officers and held the respective positions of secretary/treasurer and vice president. Mary managed the office at NIC, and she served as the day-to-day bookkeeper.

In December 1998, NIC registered to do business in Florida as a foreign corporation. Because the name "NIC" was already in use by another Florida entity, the corporation did business and operated under the trade name NIC Construction, Inc. ("NIC Construction").[2]

During the summer of 2001, NIC was engaged as a subcontractor to Shimizu America ("Shimizu") on two construction projects, one in Georgia and one in Alabama. Robertson-Ceco Corporation ("Robertson-Ceco") was NIC's subcontractor on the Georgia project. William personally guaranteed NIC's obligations to Robertson-Ceco. The Shimizu project fell into disarray, with the parties making allegations of improprieties against each other. Shimizu claimed poor performance and breach of contract against NIC, while NIC made the same or similar claims against Robertson-Ceco and Shimizu. In mid September 2001, Robertson-Ceco sent William a letter demanding payment of $279,000 for certain of its subcontracting work, which William refused to pay. Shortly thereafter, on September 22, 2001, William drew a $250,000 cashier's check from NIC's bank account (for payment to himself) and, on September 24, 2001, he deposited the full amount into his personal checking account. This withdrawal left less than $15,000 remaining in the NIC account.

In the morning of December 12, 2001, NIC filed paperwork to withdraw as a foreign corporation operating in Florida. Less than two hours later, NIC

---

[2]"NIC Construction, Inc." is also the name of NIC's successor corporation and, in that capacity, was the original plaintiff (and then counterclaim defendant) in this action. As will be discussed further *infra*, that entity has since been dismissed from the case.

Construction was formed as a Florida corporation with William listed as the sole director and shareholder. At some point during this general time period, NIC was dissolved as an Alabama corporation.

In or about February 2002, Robertson-Ceco initiated a federal action against William in the Northern District of Alabama to enforce William's personal guaranty of the debts and obligations of NIC. Mary personally accepted service of the summons and complaint filed in that case. Three weeks later, William closed the checking account in which he had deposited the $250,000 cashier's check from the NIC account, he withdrew a cashier's check in the amount of $141,339.41, and then (later that same afternoon) he deposited the new cashier's check into the NIC Construction checking account.

In or about March 2002, Robertson-Ceco filed a lawsuit against NIC in Georgia state court. Mary, as registered agent for NIC, accepted service of the summons and complaint filed in that action as well. Robertson-Ceco eventually secured a default judgment against NIC in the amount of $286,322.72, plus accrued interest through the date of the entry of judgment and all post-judgment interest accrued at the legal rate of 12% annum. During this general time period, and for many months thereafter, there were a series of allegedly questionable transactions and payments involving and between the NIC entities and members of the Cornelius family. At bottom, Robertson-Ceco contends that NIC was dissolved, that NIC Construction was formed, and that the transactions and transfer of funds between these entities and individuals were carried out for the specific and improper purpose of avoiding the legal obligation that NIC owed Robertson-Ceco.

As noted, Mary managed the office and served as bookkeeper for NIC. But, she claims that she was not serving in that capacity, and, indeed, was not even in the picture, when NIC Construction was formed as a successor corporation in December 2001. At that time --- from August 2001 until December 2002 --- she

and William were in the process of going through a bitter and "ugly" divorce. They were separated and living apart from each other. It is has been alleged that some of the transfers involving Mary were related to this separation and pending divorce. For example, William paid her expenses (and gave her thousands of dollars) pursuant to a temporary separation order issued by an Alabama state court. Mary maintains that during the separation she was not involved in the business operations of NIC or NIC Construction.[3] The divorce was not finalized, and the two eventually reconciled. Following their reconciliation, Mary performed the same job for NIC Construction that she had for NIC, and she received compensation and "perks" for doing so. However, her compensation was not in the form of a specific salary or benefits package. Rather, in lieu of a fixed salary, she would use the corporate funds to pay her personal expenses (*inter alia*, mortgage payments and credit card bills). Mary also claims that at some point she received an undisclosed amount of money as repayment for a loan that she had previously made to the corporation.

B. Procedural History

This case has had a convoluted procedural history, and the claims and parties have shifted substantially over the years. To put the case in its proper context, this history must be set forth in detail before considering the pending motions.

On August 20, 2003, one month after being awarded the default judgment

_____

[3]I note again that during this period Mary accepted service on behalf of NIC for the Alabama federal action and the Georgia state action. But, service was accomplished in both cases by leaving process with her at 1824 Mountain Laurel Lane in Birmingham, Alabama, which appears to have been her residence during the separation. Accordingly, the fact that Mary accepted service for William and/or NIC at her home does not necessarily contradict her claim that she was not involved in the business operations of NIC or NIC Construction at that time.

in the Georgia lawsuit, Robertson-Ceco filed a notice of recording in the Circuit
Court in and for Santa Rosa County. With the filing of this foreign judgment,
Robertson-Ceco asserted a lien against property of the judgment debtor. The
judgment debtor was described in the recording notice as "NIC Construction, Inc."
NIC Construction then filed suit in state court pursuant to Fla. Stat. § 55.509,
arguing that NIC and NIC Construction were separate and distinct corporations.[4]
NIC Construction maintained that the foreign judgment was unenforceable since it
"was not a named party to the action filed in the State of Georgia." The lawsuit
was later removed to this court on the basis of diversity.

Following removal, Robertson-Ceco filed its answer to the complaint and
asserted a counterclaim against NIC Construction. This counterclaim alleged that
the transactions and transfer of assets from and between NIC and NIC
Construction were fraudulent and that NIC Construction was, therefore, liable for
the judgment. The parties then engaged in preliminary discovery. During this period

---

[4]Fla. Stat. § 55.509 provides in full:

> (1) If, within 30 days after the date the foreign judgment
> is recorded, the judgment debtor files an action
> contesting the jurisdiction of the court which entered the
> foreign judgment or the validity of the foreign judgment
> and records a lis pendens directed toward the foreign
> judgment, the court shall stay enforcement of the foreign
> judgment and the judgment lien upon the filing of the
> action by the judgment debtor.

> (2) If the judgment debtor shows the circuit or county
> court any ground upon which enforcement of a judgment
> of any circuit or county court of this state would be
> stayed, the court shall stay enforcement of the foreign
> judgment for an appropriate period, upon requiring the
> same security for satisfaction of the judgment which is
> required in this state.

William filed a suggestion of bankruptcy with the court and intimated that the case should be stayed pending resolution of the bankruptcy action. The suggestion of bankruptcy and request for stay was later withdrawn before any action was taken.

Months later, Robertson-Ceco sought leave to "amend its counterclaim" to add Mary and Scott as individual defendants. Robertson-Ceco argued in support of its counterclaims against Mary and Scott (which, technically, are third party claims) that

> during discovery, Robertson-Ceco has learned that the Corneliuses have wholly disregarded corporate formalities, have commingled personal and corporate assets, and have improperly used N.I.C., Inc. and N.I.C. Construction, Inc. as shams to avoid paying debts to creditors such as Robertson-Ceco. Accordingly, not only should N.I.C. Construction, Inc. be held liable for the Georgia judgment, but so should Scott Cornelius and Mary Nash Cornelius.

I granted the requested relief and authorized the claims against Mary and Scott. William was not sought to be added (nor was he added) as a third party defendant because of his pending bankruptcy petition.

Robertson-Ceco later filed a motion for summary judgment. Mary then filed a motion to dismiss the claims against her. While these two motions were pending, NIC Construction and Scott filed suggestions of bankruptcy. In light of the bankruptcy proceedings, and the potential effect that their adjudication would have on this case, I entered an order on July 29, 2004, denying both motions and staying this litigation until the bankruptcies were resolved.

Approximately one and a half years passed. In December 2005, Robertson-Ceco moved to lift the stay as to its claims against Mary. Robertson-Ceco represented in its motion that it was no longer pursuing the third party claim against Scott, it had "no practical incentive" to try and enforce the Georgia judgment against William, and it had reached an agreement with NIC Construction

whereby that entity would "confess judgment and agree to the entry of a consent judgment holding N.I.C. Construction, Inc. liable for the entire Georgia judgment." In light of these developments, Robertson-Ceco stated in its motion:

> This Court stayed the counterclaims against Mary Nash because they "would necessarily involve adjudication of an issue likely to be central to Robertson-Ceco's claims asserted in the bankruptcies." Order of July 29, 2004, at 1-2. However, as demonstrated above, Robertson-Ceco's claims against Bill, Scott, and N.I.C. Construction, Inc. are no longer being seriously pursued for various reasons. Therefore, Mary Nash is the only remaining viable counterclaim-defendant, and . . . she has never filed for bankruptcy. Robertson-Ceco believes that Mary Nash has significant assets, including assets that she holds jointly with her husband Bill. Insofar as Mary Nash is liable for judgments against N.I.C., Inc. and N.I.C. Construction, Inc., Robertson-Ceco should be allowed to pursue its counterclaims and obtain a judgment against Mary Nash.

I granted the requested relief and lifted the stay as to the third party claims against Mary, and the case continued.

On February 27, 2006, I directed the clerk to enter final judgment in favor of Robertson-Ceco in the original action and on the counterclaim, and to dismiss all claims by and against NIC Construction. This final judgment provided as follows:

> N.I.C. Construction, Inc., a Florida corporation, is fully liable for the Order and Judgement against N.I.C., Inc., a dissolved Alabama corporation, which was ordered by the Superior Court of Cobb County, Georgia on July 2, 2003 in Case No. 02-1-2955, which was entered by the Clerk of that court on July 3, 2003 at 3:54 p.m. with ID # 2003-0077930-CV, and which was duly recorded on August 19, 2003 at 11:52 a.m. in the Circuit Court in and for Santa Rosa County, Florida (the "N.I.C., Inc. Judgement"). The N.I.C., Inc. Judgment was entered in the favor of Robertson-Ceco Corporation "in the amount of $286,322.72, plus accrued pre-judgment interest through the date of the entry of [the N.I.C., Inc.

Judgement] and all post-judgment interest accrued at the legal rate of 12% per annum.

The parties then filed the various motions now pending before the court. Specifically, Robertson-Ceco moved for summary judgment against Mary (doc. 78), seeking to hold her personally and individually liable for the Georgia state judgment. Mary has opposed this motion and, in addition, she has filed a motion for sanctions (doc. 89), a motion for the court to take judicial notice (doc. 90), and a motion to amend her previously-filed answer (doc. 92).

## II.   DISCUSSION

### A.  Robertson-Ceco's Motion for Summary Judgment (doc. 78)

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). It is well-settled that conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); see also Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On summary judgment, the record evidence and all reasonable inferences drawn therefrom must be viewed in a light most favorable to the non-moving party. National Fire Ins. Co. of Hartford

v. Fortune Const. Co., 320 F.3d 1260, 1267 (11th Cir. 2003).

Under the substantive law of Florida --- which applies to this diversity case --- "the separate identities of two or more corporations will be disregarded on a showing that one corporation is a 'mere instrumentality' of the other, and that the corporation is a device or sham to mislead creditors or exists for fraudulent purposes." Bendix Home Systems, Inc. v. Hurston Enters., Inc., 566 F.2d 1039, 1041 (5th Cir. 1978). This is frequently referred to as "piercing the corporate veil." In its leading case on the subject, the Supreme Court of Florida held that to pierce the corporate veil, a plaintiff must generally prove two things: (i) that the corporation is a mere instrumentality or alter ego of the defendant, and (ii) that the defendant engaged in "improper conduct" in the formation or use of the corporation. See Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114, 1120-21 (Fla. 1984); accord Bellairs v. Mohrmann, 716 So.2d 320, 323 (Fla. 2d DCA 1998). The corporate form may be pierced and disregarded regardless of whether the "separate identity" against whom recovery is sought is another corporation or an individual. See Tato Intern. Corp. v. Department of Treasury, 1989 WL 104789, at *5 (S.D. Fla. July 5, 1989).

In this case, Robertson-Ceco argues that the NIC entities were alter egos of each other and that NIC Construction was a mere continuation of NIC. In light of NIC Construction's confession that it is liable for the Georgia judgment, and in light of the judgment already entered in this case (doc. 76), this argument is well-taken. Robertson-Ceco next argues, and Mary impliedly concedes, that William formed NIC Construction for the improper purpose of avoiding the debt that was owed to Robertson-Ceco. Given the sudden and suspicious transfer of assets from NIC to NIC Construction, and Mary's implied concession, I accept this argument as well.[5]

---

[5]I note that the judge in William's bankruptcy case denied his discharge after finding that he had committed numerous improper acts with respect to his

See, e.g., Resolution Trust Corp. v. Latham & Watkins, 909 F. Supp. 923, 932 (S.D.N.Y. 1995) (applying Florida law and noting that if a successor corporation "suddenly liquidates" its predecessor at or around the same time that a debt of the former is about to come due, "the timing and magnitude of the transaction might raise suspicions sufficient to establish 'improper conduct'"); In re F&C Services, Inc., 44 B.R. 863, 868 (S.D. Fla. 1984) (corporate form may be disregarded "where principals of a debtor attempt to transfer corporate assets to a newly created corporate entity, which they also control, [and] when the new corporation is a mere continuation of the debtor, controlled by the same persons, and made up essentially of the same assets and resources as the old corporation"). Consequently, as a broad legal concept, the corporate form at issue here should obviously be disregarded, particularly as it concerns NIC Construction and William. The parties do not dispute that result. See Walton v. Tomax Corp., 632 So.2d 178 (Fla. 5th DCA 1994) (corporate form may be disregarded and individual found liable where he engaged in improper conduct by, inter alia, transferring and distributing corporate assets to family members to avoid business debt). But, the question is not whether NIC Construction and/or William are liable for the Georgia judgment (for clearly they are); rather, the question is whether Mary is liable, under either a standard piercing the corporate veil or unjust enrichment theory.[6]

_____

bankruptcy. See Order Denying Discharge of Debtor, dated September 12, 2005 (attached to doc. 87).

[6]I note that Robertson-Ceco has not pled "unjust enrichment" as a cause of action. Therefore, I do not interpret its pleadings to state such a claim. See generally GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1368-69 (11th Cir. 1998) (court may not allow a cause of action that is not "evident on the face of the complaint, . . .  serve as de facto counsel for a party, [or] rewrite an otherwise deficient pleading in order to sustain an action"). However, while I do not interpret Robertson-Ceco's complaint to state a claim for unjust enrichment per se, as will be discussed infra, unjust enrichment is relevant to the analysis insofar as it

"'[T]he corporate veil may not be pierced [in Florida] absent a showing of improper conduct.'" Hobco, Inc. v. Tallahassee Assoc., 807 F.2d 1529, 1534 (11th Cir. 1987) (citation omitted). In other words, it is not enough for Robertson-Ceco to argue that William acted improperly. To the contrary, summary judgment should not be granted against Mary unless there is a specific showing that she was the alter ego of NIC Construction and that she engaged in the improper conduct (*i.e.*, she attempted to avoid or deceive Robertson-Ceco). See Lovette v. Happy Hooker II, 2006 WL 66722, at *6 (M.D. Fla. Jan. 11, 2006) (individual defendant dismissed in veil-piercing case where he may have used the corporation as an instrumentality, but there was no evidence he did so "for any improper purpose"); Resolution Trust Corp., *supra*, 909 F. Supp. at 930-33 (citing multiple cases and noting that absent proof of improper conduct by the individual defendant, "courts simply do not pierce the corporate veil under Florida law"); Hillsborough Holdings Corp. v. Celotex Corp., 166 B.R. 461, 469 (M.D. Fla. 1994) ("absent proof of fraud or ulterior motive *by the shareholder*, the corporate veil shall not be pierced") (emphasis added); Steinhardt v. Banks, 511 So.2d 336, 339 (Fla. 4th DCA 1987) (reversing judgment against defendant in veil-piercing case because there was no evidence that he personally took part in any improper conduct).

Mary has repeatedly denied that she had any involvement with or knowledge of the alleged improprieties. She was never a shareholder of NIC Construction, and she has steadfastly maintained that she was not present for (or involved in) the

---

represents one way of determining whether the corporate veil should be pierced. See, e.g., Taylor v. Wellington Station Condo Ass'n, Inc., 633 So.2d 43, 45 (Fla. 1st DCA 1994) (noting that "actual wrongdoing in the form of fraud, self-dealing or unjust enrichment would have to be established in order to trigger individual liability"); Munder v. Circle One Condo, Inc., 596 So.2d 144, 145 (Fla. 4th DCA 1992) (corporate veil may be pierced, and officers, directors or stockholders held personally liable, if there is "fraud, self-dealing, unjust enrichment and betrayal of trust").

initial managing and operating of that company. Mary thus testified at deposition that she was not involved in William's financial activities, she was not in the picture when NIC Construction was formed, she does not know why it was formed, and she had no knowledge of the circumstances surrounding NIC's sudden withdrawal from doing business in Florida. She also maintains that she was just the bookkeeper at NIC Construction, that she was properly compensated for the work that she did, and that many of the challenged payments were made pursuant to the then-pending separation order and/or were reimbursements for the personal loan that she made to NIC. She denies being present for or knowing anything about the majority of the other allegedly improper transactions.

Robertson-Ceco has not put forth sufficient evidence refuting Mary's claims that she had limited knowledge and that the funds she received were owed to her. Instead, Robertson-Ceco appears to argue that knowledge of and participation in the improprieties can be inferred because Mary knew of the Georgia judgment (because, *inter alia*, she accepted process in both the federal and state actions), and yet she allowed herself to be "overcompensated" in terms of salary and she paid her bills with corporate funds. In sum, therefore, it appears that Robertson-Ceco simply believes Mary should not have taken any money from the corporation because of the pending state judgment*.*

As a threshold matter, it is not sufficient for Robertson-Ceco to argue that Mary should not have taken the money just because she knew of the debt owed to Robertson-Ceco. Her taking the money was not *per se* fraudulent or improper. Cf. Reina v. Gingerale Corp., 472 So.2d 530 (Fla. 3d DCA 1985) (predecessor corporation's conveyance of assets to another does not create a presumption of fraud or improper conduct, even when the recipient has actual knowledge of pending litigation or judgment against the predecessor). As to this issue, Ally v. Naim, 581 So.2d 961 (Fla. 3d DCA 1991) is highly instructive. The defendant in

that case was the president and stockholder of a corporation. One of his employees
was injured on-the-job, filed a worker's compensation claim and, eventually,
secured a judgment against the corporation. The employee later sued the individual
defendant and sought to pierce the corporate veil because he (the defendant) had
received corporate funds as salary during the worker's compensation claim and
lawsuit, and yet the corporation did not put any money aside to satisfy the
judgment (even though he knew of the outstanding judgment). The court held there
was nothing improper in the defendant receiving compensation during this period,
the pending judgment notwithstanding. In so holding, the court flatly rejected the
argument that personal liability can be imposed merely because "property belonging
to the corporation can be traced into the hands of the stockholders." The property
in that case was only traced to the stockholder because he was paid for the work
that he performed. Id. at 962-63; accord Keams v. Tempe Technical Institute, Inc.,
993 F. Supp. 714, 723-24 (D. Ariz. 1997) (refusing to pierce the corporate veil
where the stockholders "commingled funds, failed to observe corporate formalities,
and diverted corporate funds for personal needs;" further observing that it was of
no moment that defendant "irregularly withdrew money for personal expenses in
lieu of salary").

Mary also argues that at least some of the money was repayment for a loan.
This, too, was not *per se* improper. See generally Hilton Oil Transport v. Oil
Transport Co., 659 So.2d 1141 (Fla. 3d DCA 1995) (refusing to pierce veil where
stockholders failed to observe formalities with respect to various informal loans and
repayments); see also Hillsborough Holdings Corp., *supra*, 166 B.R. at 470,
wherein the court noted:

> [The stockholders] apparently made loans to Green
> Farms, Inc., and then obtained repayment by transferring
> assets from the corporation to themselves. Such a
> transfer of assets, however, is not necessarily a basis for

> piercing the corporate veil. The Plaintiffs must also show
> that such transfers *were done to defraud creditors or
> were done merely to siphon off corporate assets, rather
> than repay outstanding loans*.

Id. at 470 (emphasis in original).[7]

Robertson-Ceco also argues that the veil should be pierced because corporate formalities were not recognized and because there was a commingling of funds. Under Florida law, this is not enough *unless it is proven that such actions were undertaken specifically for an improper purpose*. See, e.g., Ally, *supra*, 581 So.2d at 963 (holding that, in order to pierce the corporate veil, "it is not enough to show that the corporation's business affairs had been rather poorly handled"); Hillsborough Holdings Corp., *supra*, 166 B.R. at 469-71 (collecting multiple cases for the proposition that improper conduct must be "deliberate misconduct;" thus, "absence of corporate formalities, lack of equity capital, proof of domination and control, and [evidence] that the corporation was used as a vehicle for personal interest were insufficient to establish improper conduct" because "negligence or

---

[7]For this conclusion, the Middle District relied on a state case from Delaware that is similar to the case *sub judice*. Harco National Ins. Co. v. Green Farms, Inc., 1989 WL 110537 (Del. Ch. Sept. 19, 1989). In that case, there was commingling of funds, undocumented loans/repayments, and transfer of assets between family members. This took place at the time of or after the corporation had consented to an entry of judgment against it in another case. The court concluded that: "persuading a [trial] court to disregard the corporate entity is a difficult task, even after trial on the issues. Consequently, the piercing of the corporate veil on a motion for summary judgment is an even more onerous task and, while the present record seems to indicate that Green Farms, Inc. was the alter ego of John L. Green, Sr. or the other stockholders, I cannot find that the entry of a final judgment is proper at this time." Id. at *6. Although Harco is a Delaware state case, it has been cited in Florida case law and, furthermore, the Eleventh Circuit has specifically noted that Delaware and Florida law are the same on veil-piercing. Rodriguez v. Murphy, 895 F.2d 725, 729 n.6 (11th Cir. 1990).

even reckless conduct" is insufficient under Florida law); In re Hillsborough Holdings Corp., 176 B.R. 223, 244-45 (M.D. Fla. 1994) (citing Florida cases and holding that fraud and/or intentional wrongful conduct is required to pierce corporate veil because "negligent or reckless behavior does not constitute improper conduct"); Resolution Trust Corp., *supra*, 909 F. Supp. at 930-33 (operating corporation in a "loose and haphazard manner" is insufficient under Florida law); Elizabeth D. Clark, *Piercing the Corporate Veil in Florida: The Requirement of "Improper" Conduct*, 16 Stetson L. Rev. 60, 108 (1986) (Florida courts often exhibit "a high degree of tolerance for unusual and irresponsible business activities designed to benefit the shareholders at the expense of the creditors").

In Hilton Oil Transport, *supra*, 659 So.2d at 1141, the Third District Court of Appeal held that it was error for the trial court to pierce the corporate veil and hold an individual stockholder liable. The company in that case was (as here) a private, closely-held corporation that did not recognize certain corporate formalities, there were overlapping directors and officers between the corporation and other entities, and the defendant routinely and without promissory notes "borrowed funds from another entity controlled by him or made a personal loan to the company himself." In reversing the trial judge (who ruled that the defendant could be personally liable), the appellate court noted that the foregoing factors indicated that the defendant "operated Hilton in a loose and haphazard manner," but that such business practices "certainly would not justify the imposition of personal liability against him" without a showing that he had a fraudulent, illegal or improper purpose. The court stated: "we do not believe that it is at all unusual for a private, closely-held corporation to have such poor business practices." Id. at 1152-53.[8]

---

[8]In any event, as noted, whether Mary improperly managed corporate funds and used them for her personal benefit is relevant only in determining if she was a principal or alter ego of NIC Construction. It does not by itself prove that she did so

Importantly, the foregoing analysis applies whether this litigation is viewed as a standard veil-piercing case, or whether the corporate form is disregarded under a theory of "unjust enrichment." In other words, for Robertson-Ceco to prevail against Mary as a matter of law, there must be a compelling reason to hold her liable. It is not enough for Robertson-Ceco to argue that money which should have gone to pay the judgment "can be traced into [her] hands." See Ally, *supra*, 581 So.2d at 963. By definition, the question is not whether Mary was enriched; rather, the question is whether she was *unjustly* enriched. Under Florida law, it appears that unjust enrichment in this context may be shown in one of two possible ways.

As for the first way, a person is "unjustly enriched" when she receives a benefit by committing fraud or actively engaging in improper conduct. See Munder, *supra*, 596 So.2d at 145 (individual liability may be imposed if there is "fraud, self-dealing, unjust enrichment and betrayal of trust"); Taylor, *supra*, 633 So.2d 43, 45 ("actual wrongdoing in the form of fraud, self-dealing or unjust enrichment would have to be established in order to trigger individual liability"); Chase Manhattan Bank v. S/D Enterprises, Inc., 353 So.2d 131, 133 (Fla. 3d DCA 1978) (observing that "under a long line of Florida cases," before unjust enrichment can be found, "certain factors such as fraud, affirmative deception or material misrepresentation must first be present"); cf. Boca-Med Associates Ltd v. Glassman, 464 So.2d 646, 648 (4th DCA 1985) (no unjust enrichment where defendant "did nothing unjust"). The Florida Supreme Court is in accord. See Rinker Materials Corp. v. Palmer First National Bank and Trust Co. of Sarasota, 361 So.2d 156 (Fla. 1978) (rejecting the argument that a person can be found liable for unjust enrichment in the absence of wrongdoing; holding that "the overwhelming weight of authority in Florida" demonstrates that unjust enrichment will be found "only where there is proof of

---

for the specific improper purpose of hiding assets from creditors.

*Case No.: 3:03cv475/RV/EMT*

fraud, misrepresentation, or other affirmative deception").

Robertson-Ceco relies primarily (if not entirely) on supposition and innuendo in trying to establish that Mary acted improperly. Mary steadfastly maintains that she did not have any knowledge of the alleged improprieties because she was not in the picture for most of the relevant time. The finder of fact may not believe her. When she and William reconciled and she returned to the business, perhaps she was not paid for performing her bookkeeping duties (or perhaps she was overpaid). Perhaps she was not reimbursed for a prior loan and/or she was not given money under the separation order. Perhaps she commingled funds, not because that is how she was paid in lieu of a salary, but rather because she was siphoning and depleting corporate assets so that Robertson-Ceco would not be paid. But, in the absence of clear and contrary evidence, that is an issue to be decided by the finder of fact. See, e.g., Walton, supra, 632 So.2d at 178 (reversing directed verdict in veil-piercing case; noting that such cases often turn on "questions of credibility" and should generally be presented to the fact finder).

As for the second way, unjust enrichment may be shown where the defendant receives an undeserved windfall. For example, the defendant employee in Sharp v. Bowling, 511 So.2d 363 (Fla. 5th DCA 1987) did not have enough withholding tax taken from her paycheck, and her employer was subsequently liable for paying that amount to the IRS. The employer sued the employee to collect that amount, and the trial court dismissed the complaint on the ground that the employer had made a "unilateral mistake." In reversing, the Fifth District Court of Appeal held that "the employee has clearly been unjustly enriched at the expense of her employers as she received from IRS money to which in equity and law she was not entitled and for which her employers were forced to reimburse IRS. In equity and good conscience she should be required to reimburse her employers." Id. at 365; accord Alaska Sales & Service, Inc. v. Millet, 735 P.2d 743 (Alaska 1987)

(noting that to recover under an unjust enrichment theory, "the enrichment to the defendant must be unjust; that is, the defendant must receive a true windfall or 'something for nothing'").

In this case, by way of illustration, Mary may have been unjustly enriched at Robertson-Ceco's expense if she had been given the money as a gift, or if the funds had been transferred to her bank account inadvertently. But, Mary argues (and the fact finder could reasonably conclude) that she did not receive a "something for nothing" windfall. Rather she claims that she received the money as part of her salary, as repayment for a personal loan, and as payment under the separation order. In other words, she claims that William and/or NIC Construction owed her that money. It is arguable, therefore, that Mary was a creditor, along with Robertson-Ceco. In Millet, *supra*, the Alaska Supreme Court cited Florida case law (and cases from other jurisdictions) in holding that: "substantial authority exists for the proposition that there is no unjust enrichment where one creditor receives payment from a common debtor while another creditor is left unpaid." Id. at 747; see also Ally, *supra*, 581 So.2d 961 (holding that it was not improper for defendant to receive compensation and assets from corporation during the time that the corporation owed money to plaintiff on an outstanding judgment).

Therefore, whether Mary was overpaid (in Robertson-Ceco's opinion) and used corporate funds to pay her personal expenses does not, by itself, demonstrate that she did so for the fraudulent, misleading, or otherwise improper purpose of misleading creditors. To say that she was overcompensated and that she mixed, commingled, and failed to recognize formalities of corporate accounts is not the same thing as saying that she did so in order to hide assets from Robertson-Ceco. The full extent of her involvement in the improper conduct, if any, and whether she should be viewed as a principal of NIC Construction, is obviously up for debate. Although the finder of fact may disbelieve her version of events and professed

limited knowledge, the evidence is insufficient on this record to make that finding as a matter of law. Therefore, resolving all ambiguities and viewing the facts in her favor, summary judgment is inappropriate.

    B. <u>Mary's Motion for Sanctions (doc. 89)</u>

    Mary moves for sanctions against Robertson-Ceco pursuant to Rule 11 of the Federal Rules of Civil Procedure, arguing that the above-considered motion for summary judgment "does not appear to have been filed in good faith, primarily because there are multiple disputed facts and issues." For the reasons discussed, I agree that there are disputed issues and facts that preclude summary judgment. But, that does not automatically mean the motion was filed in bad faith. Mary's motion for sanctions is meritless and denied without further discussion.

    C. <u>Mary's Motion for the Court to Take Judicial Notice (doc. 90)</u>

    Mary next moves the court to take judicial notice of the order entered by the bankruptcy judge denying William's discharge from his debts. The reason for this motion is unclear.[9] In any event, to the extent the bankruptcy order may have a bearing on future proceedings in this case, I will take limited judicial notice of the order as permitted by law. <u>See</u> <u>United States v. Jones</u>, 29 F.3d 1549, 1553 (11th Cir. 1994) (noting that "if it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous;" therefore, "a court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation").

    D. <u>Mary's Motion to Amend Answer (doc. 92)</u>

    And lastly, Mary moves to amend her answer to Robertson-Ceco's third

---

    [9]It appears that Mary seeks judicial notice so the bankruptcy order could be used in opposition to Robertson-Ceco's motion for summary judgment. If so, because summary judgment was denied, the motion for judicial notice is moot.

party complaint. This amendment seeks to do two things: add a statute of limitations defense, and add a demand for a jury trial. Rule 15 of the Federal Rules of Civil Procedure governs the amendment of pleadings. This rule provides that leave to amend shall be freely and liberally given when justice so requires. Fed. R. Civ. P. 15(a); see also 3 Moore's Federal Practice § 15.14[1] (3d ed. 2006) (stating that "a liberal, pro-amendment ethos dominates the intent and judicial construction of Rule 15(a)"). However, the ability to amend pleadings is not without bounds. It is well-settled that amendment may be denied where there is futility, undue delay, bad faith or dilatory motive on the part of the movant, and/or undue prejudice to the non-movant. See generally Foman v. Davis, 371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). At least two of these circumstances are present here.

First, as for the statute of limitations claim, Mary argues that this defense presented itself only after the focus of this case shifted from the original claim by NIC Construction, to the claim seeking to pierce the corporate veil against her. Only when that took place did "legal research of appropriate cases" reveal the statute of limitations defense. However, this litigation shifted in her direction when she was added as a third party defendant in May 2004. She did not move to add this affirmative defense until approximately *two years* later, in April 2006, and she has offered no explanation or excuse for her delay in doing so.

As for the jury demand, Mary states that she meant to (and thought she had) included a jury demand in her answer to the third party complaint. She thus maintains that her failure to request a jury trial was an inadvertent omission. Robertson-Ceco argues undue delay and waiver, however, because Mary failed to serve her demand "not later than 10 days after the service" of her answer, which is required under Rule 38 of the Federal Rules of Civil Procedure. Indeed, "waiver by failure to make a timely [jury] demand is complete even though it was inadvertent and unintended and regardless of the explanation or excuse." 9 Charles

Allen Wright & Arthur R. Miller, *Federal Practice and Procedures* § 2321 (2d ed. 1994) (collecting cases). Robertson-Ceco further argues that it will be prejudiced if the much-belated jury demand is allowed because "this case has been pending for three years and the [third party claim] against this Defendant has been pending for two years. Robertson-Ceco is ready to move forward expeditiously, and a jury trial will be less expeditious and more costly than Robertson-Ceco had planned when it moved to lift the stay." I agree with Robertson-Ceco on both points and, therefore, Mary's motion to amend her answer is denied.[10]

---

[10]Even if there had not been delay, waiver, and undue prejudice, it is highly questionable whether Mary would have been entitled to a jury trial. Robertson-Ceco contends that, as a general matter, defendants are not entitled to jury trials in veil-piercing cases. This argument enjoys some support in case law. See, e.g., International Financial Services Corp. v. Chromas Technologies Canada, Inc., 356 F.3d 731 (7th Cir. 2004) (holding that piercing the corporate veil is an equitable doctrine and, as such, defendant is not entitled to jury trial); In re Seminole Walls & Ceilings Corp., 336 B.R. 539, 545-46 (M.D. Fla. 2006) (holding there is no right to a jury for veil-piercing claims); In re iPCS, Inc., 303 B.R. 527 (N.D. Ga. 2003) (holding same). But, this case law appears to conflict with precedent in which the former Fifth Circuit stated (albeit without meaningful analysis or support): "This Court holds that the issue of corporate entity disregard is one for the jury." FMC Finance Corp. v. Murphree, 632 F.2d 413, 421 n.5 (5th Cir. 1980); see also Federal Deposit Insurance Corp. v. Franchise Finance and Management Co., Inc., 354 F. Supp. 1016, 1019-20 (S.D. Fla. 1973) (holding that right to jury trial exists in veil-piercing case because "a suit to pierce the corporate veil is a legal claim"); accord Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131 (2d Cir. 1991) (holding that "it was entirely proper for the district court to submit the corporate disregard issue to the jury" because, *inter alia*, whether the corporate form should be pierced "is the sort of determination usually made by a jury because it is so fact specific"). The confusion is brought about by the nature of the so-called veil piecing cases. They usually involve both legal (*i.e.*, jury) and equitable (*i.e.*, non-jury) issues. I need not, and do not, enter this thicket of conflicting opinion. For the reasons stated, Mary has waived any right to a jury trial (assuming *arguendo* that she had one) by not presenting a timely demand or providing a justifiable reason for her failing to do so. To hold otherwise would be unduly prejudicial to Robertson-Ceco on the facts of this long-pending case.

III.    **CONCLUSION**

For the above-stated reasons, the motion for summary judgment filed by Robertson-Ceco (doc. 78) is DENIED. The motions filed by Mary are decided as follows: the motion for sanctions (doc. 89) is DENIED; the motion for the court to take judicial notice (doc. 90) is GRANTED to the limited extent as set forth above; and the motion to amend her answer (doc. 92) is DENIED.

DONE and ORDERED this 30th day of March, 2007.

/Roger Vinson                          

**ROGER VINSON**
**Senior United States District Judge**